Judge Green
delivered his opinion.
The original bill in this case was filed by the appellee, a creditor of Lewis Nicholas, for the purpose of setting aside a conveyance of land, made by the debtor to John H. Coleman; another made to Charles Wingfield, and the said Coleman; and also, a transfer of personal property, made by Nicholas to Wingfield and Coleman; and a conveyance of land, made by the latter to Edward Garland; as being fraudulent and void as to him. A chronological review of the transactions brought in question, will best explain their nature.
On the 12th of November, 1818, Wilson Cary Nicholas purchased of the appellee a sterling bill of exchange, for 3000/. in consideration.of which, he gave him his note, endorsed by Lewis Nicholas, for $ 16,046, payable on the first of January, 1820, with interest from the first of .December, 1818. A suit was instituted on this note, against Wilson C. Nicholas and Lewis Nicholas, in February, *290 1820. The defendants, in June, 1820, pleaded severally, and rested their defence upon the ground, that the transaction between Wilson C. Nicholas and Rives, was usurious. Judgment was rendered for the plaintiff against Lewis Nicholas, in August, 1841; Wilson C. Nicholas having departed this life during the pendency of the suit. Lewis Nicholas was taken upon a Ca. Sa. issued upon this judgment, took the oatH of an insolvent debtor, on the 21st of August, 1821, and was discharged. In his schedule, he stated that he had “no properly of any description whatsoever.” /
Pending this suit, and on the 16th of May, 1820, John H. Coleman intermarried with a daughter of Lewis Nicholas; and on the first day of June, the latter conveyed to the former 3842 acres of land, part of a larger tract, on which Lewis Nicholas resided, and six slaves, professedly in consideration of an agreement made between them, before and in consideration of the marriage'. This deed was recorded in November, 1820, and is one of the deeds impeached.
Lewis Nicholas heing bound as endorser for a debt of $6,991 84, due from Wilson C. Nicholas to the Farmers5 Bank of Virginia, on the 9th of August, 1820, conveyed 22 negroes in trust, to secure the payment of this debt to the Bank, on the 1st of June, 1827, with interest thereon, payable annually from the 27th of July, 1820. This deed was duly recorded, and is not questioned.
Edward Garland also held a negotiable note of Wilson C. Nicholas, endorsed by Lewis Nicholas, dated July 23, 1819, payable 30 days after date, for $13,800. These three debts, together with one due to Saunders, upon a note of Wilson C. Nicholas endorsed by Lewis Nicholas, for about $7,000, and which was in suit against Lewis Nicholas, before the arrangements hereafter mentioned were entered into, were the only debts of any consequence, due by Lewis Nicholas. And he states, that he never voluntarily engaged for these debts, except that to the Bank: that *291 Wilson C. Nicholas being entrusted by him with his endorsements iu blank, for the purpose of continuing the note endorsed by him at Bank,'had filled them up, and delivered them to Rives, Garland, and Saunders, without his knowledge or consent.
Garland, having in vain endeavoured to get a security from Wilson C. Nicholas for his debt, forwarded the note which beheld to an attorney, (Mr. Dyer,) with instructions to bring suit upon it, expressing, at the same time, a wish to have the debt secured without litigation, and authorising the attorney to make any arrangements to that effect. A writ was ordered on this note, on the 23d of December, 1820, but never issued, in consequence of 1he arrangement afterwards made. In pursuance of Garland’s instructions, his attorney entered into negotiations with Lewis Nicholas, and the latter expressed a willingness to secure the debt; but before any thing was done, it was proposed by Wingfield and Coleman, the sons-in-law of Lewis Nicholas, that if Garland would make a considerable discount, (the amount of which was communicated to Garland by his attorney,) they would purchase his debt, and give their own bond for the amount to be paid to him. Garland’s attorney communicated this proposition to him, and informed him, “ that it was understood, that Lewis Nicholas intended to sell all his property at public auction, and was willing to secure Wingfield and Coleman, as the owners of Garland’s(S.C,bt; and itwas also understood, that Wingfield and Coleman intended to bid at the sale, to the amount of the said debt; and it was further proposed by Wingfield and Coleman, more effectually to secure the amount to be paid to Garland, by incumbering, for that purpose, any property which they might purchase at the sale.” The attorney was unwilling'to accede to the terms proposed, without Garland’s sanction in person, and wrote to him, requesting him to go to Albemarle, that he might be consulted on the subject. Garland went to Albemarle, and after much hesitation, on account of the heavy discount re *292 quired, at length, fearing that Rives might get a priority over him, and that he might lose his debt entirely, “ he determined to accede to the proposition made by Wingfield and Coleman, and accordingly passed his debt to them, and took their bond for $13,000,” payable to him ten years after date, without interest; “and after the transfer was made, Lewis Nicholas executed a deed of trust conveying certain lands, slaves, and other personal property, to secure the debt so transferred to Wingfield and Coleman.” These statements are taken from Garland’s answer,- and correspond with the answers of the other parties.
These arrangements were made on the 18th day of January, 1821. That is stated to be the date of the bond to Garland for $13,000, said to be given by Wingfield and Coleman, in their deed to trustees for Garland, of the 15th of February, 1821, hereafter to be noticed: and that is the date of the deed of trust, given by Lewis Nicholas to trustees for Wingfield and Coleman, spoken of in Garland’s answer. Garland was privy to the terms of this last mentioned deed; as was Dyer, his attorney. Garland’s answer admits the first, and Dyer, with Harris, the attorney of Lewis Nicholas, and Wingfield and Coleman, are subscribing witnesses to the deed. The original deed exhibited by Wingfield and Coleman, is here by subpoena duces tecum, and it appears to me, by inspection, that Dyer wrote about one half of the deed, from the beginning-down to the description of the land conveyed, and Harris the remainder.
The particulars of this deed, (although it is not recorded and cannot be relied upon as giving any title,) are material. The original deed, as it was executed, is between Lewis Nicholas of the one part, Wingfield and Coleman of the second part, and T. J. Randolphaná C. Cocke of the third part; and recites, that “ the said Lewis Nicholas is justly indebted to Edward Garland as endorser of a note drawn by Wilson C. Nicholas, bearing date the 23d day of July, 1819, negotiable and payable thirty days after its date, at *293 ihe Bank of Virginia, for the sum of $ 13,800, and which said note, the said C. Wingfield and J. FI. Coleman have fully discharged and paid to the said Edward Garland, on the part of the said Leíais Nicholas, and for which, the said Lewis Nicholas is desirous to secure and save them harmless.” Since the execution of the deed, the words “on the part of the said Lewis Nicholas,” and the word “for,” and the words “and save,” and the word “ harmless,” have been dashed out with a pen, hut so as to leave them perfectly legible; and the words, “ the payment of,” are interlined after the words “to thesaid Edward Garland.” ■ The word “ to,” has been inserted before the word “ them;” so as to make the deed read as it is copied into the record ££And which note, the said Wingfield and Coleman have fully discharged and paid to the said Edward Garland, and the payment of which the said Lewis Nicholas is desirous to secure to them, the said Coleman and Wingfield.” No note is made at the foot of the deed, of these interlineations and erasures, as made before signing or otherwise; whilst other interlineations in the deed, are noted as made before signing, and the witnesses subscribe under this note; a clear proof, that the erasures and interlineations above specified, were made after the deed was executed.
Neither Nicholas’s note, nor Wingfield and Coleman’s bond, are exhibited. We have not the written evidence which exists, as to what passed bétween Garland and Wingfield and Coleman, on this occasion. If we had this evidence, we might see whether Garland endorsed the note to Wingfield and Coleman; and if he did, whether it was specially endorsed, without recourse to him; or, whether their bond is unconditional or otherwise. I doubt whether the note was really sold to Wingfield and Coleman. The deed, in its original form, declared that, they had paid it to Garland, on the part of Lewis Nicholas; and, that it was intended only to secure and save them harmless; a stipulation perfectly proper, if *294 they gave their bond for % 13,000, payable in ten years, interest; not for the purchase of the debt for themselves, but in satisfaction of the debt on the part of Lewis Nicholas ; in which case, they could only have claimed an indemnity against this responsibility. Such a stipulation would have been, in no manner, adapted to the case, if they had purchased the debt for themselves. However this may be, I shall consider the case as if the debt were really sold and transferred, as stated by the parties.
The deed proceeds, in consideration of one dollar paid by Wingfield and Coleman to Lewis Nicholas, to convey to them the lands on which he resided, containing 2100 acres, more or less, five negroes by name, (this was the residue of Lewis Nicholas’s land and negroes, after taking out the land and negroes conveyed to Coleman, and the negroes conveyed in trust for securing the debt to the Bank,) and also, his_equity of redemption in the slaves conveyed to secure the debt to the Bank, his stock of horses, cattle, hogs and sheep, all his plantation utensils, household and kitchen furniture, all the meat on hand, all his beds, bed clothes, and furniture of every description, a four wheel carriage, a waggon and two carts, and the crops of grain on hand, and what may be made hereafter; to have and to hold to Randolph and Cocke, in use and trust for Wingfield and Coleman and their heirs for ever; with authority to Randolph and Cocke to sell the whole of the-land and other property for cash, after ten days notice of the time and place of sale, by advertising the same at the door of the court-house of Albemarle county, and out of the proceeds of sale, after paying expenses, to pay the said note, interest and costs, and the balance, if any, to Lewis Nicholas.
In the Enquirer of January 25th, 1821, an advertisement appeared under date of January 20th, and with the signature of Lewis Nicholas, notifying that on the 15th day of February, 1821, he would sell, on the premises, for cash or on a short credit, as he might choose on the day of *295 sale, his tract of Umd of 2141 acres, his horses, cattle, household and kitchen furniture; also, all the other property which he owned. No slaves are mentioned in this advertisement; although Lewis Nicholas owned, and professed to sell on the day of sale, the slaves mentioned in the deed of trust of January 18th, besides those conveyed in trust to secure the Bank debt, and those before conveyed to Coleman.
On the 15th of February, 1821, the sale was made professedly for cash, and Wingfield and Coleman were the purchasers of all the property sold that day, save one horse purchased by Omohundro; and the next day, they purchased the residue of the personal property, down to a set of razors, old case and brush, whether at public or private sale, does’ not appear; and Lewis Nicholas gave them a certificate under his hand and seal, at the foot of a schedule of the articles professed to be sold, that he claimed no right or title in any of the property, nor any control over it. This is dated February 26th, 1821. The amount of the sales to Wingfield and Coleman, waá $ 12,946 30 cents. There was no competition in the biddings, except in the purchase of the horse by Omohundro, and Wingfield and Coleman bid against each other for the land. The general impression, amongst those who attended the sale, was, that it was a mere contrivance to protect Lewis Nicholas’s property from Hives’s claim; and Wingfield and Coleman, (who, as long as the amount of their purchases kept within the amount of their claim, had no motive to bid low, so that their claim covered the whole property,) might obviously have bid what they pleased; and, indeed, without frustrating their object, bid againsteacb other. Accordingly, the property sold for little more than half its cash value, if indeed so much as that.
To see this sacrifice of the personal property, it is only necessary to inspect the list of sales, and compare it, as to some of the items, with the evidence. Oats in the straw sold at 5 cents a hundred", and fodder at 6jj cent? a hum *296 dred. This very property, for which Wingfield and Coleman gave # 2,946 30 cents, sold afterwards, under the decree of the Court, for $ 5,576 69 cents, cash. This is the amount of the Marshal’s sales, after deducting the sales of tobacco and wheat. The sale by the Marshal was on the 21st of August, when there was a much smaller quantity of corn on hand, than at the time of the sale by Leiois Nicholas on the 15th of February. The price of the land, $ 10,000, was inadequate in the same ratio. The whole tract was sold together. I think that the evidence, consisting of the opinions of witnesses, shews satisfactorily, that the land was then worth, in cash, at least #8 per acre; Which would amount to upwards of # 17,000: and upon the usual credits of one, two, and three years, at least $ 10 per acre; which would amount to upwards of #21,000. But, there is more decisive evidence of its value, than the opinions of the witnesses. Jesse Jopting testifies, that pending Hives’s suit, Lewis Nicholas applied to him to be his security, upon an appeal, if the suit went against him; and offered to give him a deed of trust upon his land, containing, as he said, about 2000 acres, which Lewis Nicholas considered as a good indemnity against the debt, interest, damages and costs, which could not have amounted to less than #20,000; in which opinion, Jopling concurred, and agreed to become his surety, if the appeal was taken; and on the day that Wingfield and Coleman purchased the land, they pledged it, and Garland accepted it as an ample security for #13,000. These circumstances shew sufficiently the opinions of the parties concerned, as to the value of the land.
The negroes conveyed to Coleman in June, 1820, were exposed to sale in mass, on this occasion, as the property of Lewis Nicholas, with Coleman’s consent, upon the advice of counsel that he had no title; and the land conveyed to him was conveyed with the residue of the tract to him and Wingfield, as if sold to them at this sale.
*297 On the 16th of February, 1821, the land was conveyed by Lewis Nicholas to Wingfield and Coleman; and on' the same day, they conveyed the 2141 acres (the residue of the tract, excepting what had been conveyed in June, 1820, to Coleman) to Coles and Cocke, in trust to secure the payment of their bond to Garland,, for % 13,000, dated January 18th, 1821, and payable ten years after date, without interest. These deeds were acknowdedged before magistrates, and the privy examination of the wives of Wing-field and Coleman, taken on the same day, and recorded on the next day. In anticipation of the results of this sale, and according to the previous arrangements between the parties, these deeds W'ere prepared before the day of sale, and arrangements made with persons, who had agreed to act as trustees in the deed, to secure Garland’s debt, and the attorney for Garland attended on the day of sale, to have the deed executed. This appears from the deed of trust, and the answer of Coles, one of the trustees. After the deed W'as written certain interlineations were noted, as made before signing; and at the foot of this note, the usual clause of attestation was written; and below this clause, these words are written: “The names of the trustees also ¿hanged before signing.” The time and reason of this change appear from Coles’s answer. He says, “that when the sale had nearly closed, he was applied to by one of the pérsons who seemed most active, and, he presumes, was one of the legal advisers present, to become trustee to secure the payment of the bond, due from Wingfield and Coleman to Garland, by a lien on the land that was late Nicholas’s: that he declined acting, under the general impression that he wished to have no part in the transactions of the day. But, being strongly urged on the ground that one of the parties that had consented to act, had, by some means, been prevented attending; and that they would find some difficulty in getting a fit person as his substitute; losing sight of the original impression, and being solely actuated by a wish to serve neighbours, he became a party, ” The *298 other trustee, Cocke, states that the counsel on both sides attended the sale, and that his confidence in them, induced him to agree to act as trustee.
Wingfield and Coleman filed a cross bill, impeaching Hives’s claim as usurious. The Court of Chancery deci eed all the conveyances to be fraudulent and void as to Rives, and that his judgment was Valid and unimpeachable; and Garland alone appealed. The only question, therefore, for this Court to decide, is, whether Garland’s lieu be valid or void as it respects Rives; whether Rives’s judgment can be impeached in this way; and if it c-m, whether it. is infected with usury, or not.
As to the conveyance in consideration of a pretended marriage contract, it may be observed, that there is not a shadow of doubt as to the propriety of the decree. There was no such contract; nor does C.o/eman, in his answer, allege that there was. The whole case in truth was, that L< ivis Nicholas had frequently, in conversation with his neighbours, said that he should make his children equal, and that the law made the best will. Coleman had heard of these declarations, and Lewis Nicholas had advanced his daughter, Mrs Wingfield. upon her marriage.
It is impossible to look at the particulars of these transactions, without a conviction, amounting to absolute certainty, that on the part of Wingfield, and Coleman, and Lewis Nicholas, the motive, under which it is attempted to cover and protect, these transactions (the preferring a just creditor, and securing the payment of a just debt,) had not the weight of a feather with them: that their sole motive for dealing with that debt as they did, was to enable them by means of it, to prevent'Rives, and perhaps Saunders, who were prosecuting their suits, from getting satisfaction to the amount of a cent, out of the property of Lewis Nicholas; and at the same time, to secure to Wing-field and Coleman, the sons in law of Nicholas, his whole property, except the slaves pledged to the Bank, at ahout half its value, upon a credit of ten years, without interest; *299 and indeed, without, in all probability, paying ultimately one cent out of their own funds. For, having a right to the 22 valuable labouring slaves, pledged to the Bank, for upwards of six years, charged only with the payment of the interest on the Bank debt, of $420 per annum, they might reasonably expect to raise the $13,000, or very nearly the whole, from the profits of the property, in the course of the ten years. Wingfield and Coleman could not possibly have any motive for preferring the debt to Garland, independently of the views which I have attributed to them. They were under no legal or moral obligation to pay it, or to 'take any care about its payment. They were not bona fide purchasers nor creditors seeking to avoid a loss. The question was not with them, de damno evitando, but emphatically dp lucro capiendo. Nicholas, although under a legal, was under no moral, obligation, to pay this debt He was only a surety, and that, not voluntarily. The obligation was imposed on him by the fraudulent use of the note to another purpose, than that for which he endorsed it. Garland was willing to have given Nicholas the same terms which he gave to Wingfield and Coleman, and to have taken a direct and fair lien upon his property. To have acceded to those terms, would have looked like a preference of one creditor to another; and that, upon reasonable and intelligible motives. • But, the rejection of the great advantages of these terms, and preferring to subject his property to a cash sale, for the wh.<le amount of the debt and interest; giving to his sons-in law the advantage of the discount and credit, instead of taking it himself; the struggling to reduce Garland to the lowest terms, not for the benefit of Nicholas, but of bis sons-in-law; and the whole dealing of the parties in respect to this debt, and the use made of it; shew that the preferring of Garland's debt did not enter into the motives of these parties; and that the only motives which actuated them, were those before stated. As to these parties, it is a case of pure and unmixed fraud. If we were called upon, in *300 any other character than that in which we are acting, to judge of their-conduct, great allowances might very properly be made. A highly respectable man, advanced in years, in affluent circumstances, having a family brought up in ease, is suddenly involved in utter ruin, not by his 'own misconduct, but as the surety of a friend who had betrayed his confidence, and who, he believed, had been forced by his necessities into the hands of usurers, resorts to means advised as legal by respectable but mistaken counsel, to save a remnant of his property; and the members of his family unite with him in those measures. We cannot see such a case without great pain, nor condemn the actors with severity. But, such considerations cannot enter into any system of laws, nor be the foundation of any right, legal or equitable.
As to Garland, I have not a shadow of doubt, that, as he states in his answer, his only motive for taking the part which he did in these transactions, was to secure as much of his debt as, by any means, he could under existing circumstances; and thaf he would have preferred a direct security from Lewis Nicholas, to the course which was taken; and which he yielded to from necessity, as the only means of securing any thing; although he knew the purpose for which these arrangements were proposed by Lewis Nicholas and Wingfield and Coleman. When Lewis Nicholas declined to give a direct security, and Wingfield and Coleman made their propositions, a full outline of their scheme* and the use they intended to make of his debt, was communicated to him. If this did not, at the first blush, satisfy him that their design was to make a fraudulent use of it against Nicholas’s creditors, he ought to have been convinced upon that point, when he and his counsel, on the 18th of January, 1821, were apprised of the terms of the deed of that date, which provided for the sale of Nicholas’s entire property for cash, upon ten days notice, by advertisement at the court-house door only, to indemnify Wingfield and Coleman to the amount of the whole *301 debt, for giving their bond for a part of the debt, payable ten years after without interest; and if that was not sufficient to apprise him of their real intentions, his agent and counsel had full notice of the true object of all these arrangements, when, on the 15th of February, the whole scheme was completely consummated. Garland, if not a participator in the fraud, had at least full notice of it; and if not in all its stages, yet certainly before the execution of the deed under which he claims.
It could hardly be contended in a Court of Law, that this conveyance to Wingfield and Coleman, was not fraudulent and void as to the creditors of Lewis Nicholas. The Statute of Frauds, avoids all conveyances contrived of covin, malice, fraud, collusion or guile, with intent or purpose to delay, hinder or defraud creditors; except in cases where, though the grantor has a fraudulent intent, the purchaser acts bona fide, and gives a valuable consideration. Without the bonafides on the part of the grantee, the valuable consideration has no effect in rescuing- the transaction from the literal terms and spirit of the Statute. If Wing-field and Coleman could be considered as bona fide creditors for % 13,000, and had aimed only at securing or getting payment of the debt, they would have been protected by the proviso of the Statute, no matter what had been the fraudulent intent of the grantor. But, the moment they passed this line, and mixed with this object, that of delaying, hindering, or defrauding creditors, any conveyance made in furtherance of this compound object, was absolutely void, and they were left (as they were before they attempted the fraud) creditors without a security. “ Quod alias justum et bonum est, si per fraudem petatur, malum et injustum ejficitur.” One and the chief object with them, if not the sole motive for the part they acted in these transactions) was, by covin with Lewis Nicholas, to delay, hinder and defraud all his creditors, except Garland.
*302 But, it is insisted, that Garland being a bona fide creditor, and having taken a security from Wingfield and Coleman on the property conveyed to them by Lewis Nicholas, for the debt really due, he falls within the exception of the Statute of Frauds, being a bona fide purchaser for value; and that, although the conveyance to Wingfield and Coleman, was fraudulent and void. The construction of tifie proviso, has been much discussed, and many cases upon that point, have been cited. A careful attention to the terms of the Statute, and a comparison of it with the Statutes of 13th and 27th of Elizabeth, will, I think, without a particular examination of the authorities cited, satisfy us as to its true construction.
The Statute of 13 Eliz. against fraudulent conveyances as to creditors, has this proviso; “ that this Act, nor any thing therein contained, shall not extend to make void any estate or conveyance, &c. had, made, &c. or hereafter to be had, made, &.c. which estate or interest, is or shall be upon good consideration and bong fide lawfully conveyed or assured to any person or persons, not having, at the time of such conveyance or assurance to them made, any manner of notice, or knowledge of such covin, fraud or collusion as aforesaid. ”
The Statute of 27 Eliz. for securing subsequent purchasers against conveyances intended to defraud them, had a proviso to the same effect as the above stated proviso of the 13th Eliz. except that the words in italics, at the close of the proviso of the 13th Eliz. as above quoted, were omitted in the proviso of the 27th Eliz. The reason of this difference, in the terms of the provisos of these Statutes, is obvious. If a conveyance were intended to defraud subsequent purchasers, that intent could-not possibly be known to have existed, until a sale was actually made by the vendor to a subsequent purchaser; and if a purchaser for valuable consideration, procured a conveyance from the fraudulent grantee before any other made a purchase from the fraudulent grantor, then, at the time of the purchase from the. *303 fraudulent grantee, the purchaser could not only not have notice of any fraudulent intent in the original grantor, but could not do an injury to any one; as no one had an interest iu the subject, who could object to his purchase. Such a purchase for value would be bona fide; and the purchaser would be entitled against any subsequent grantee from the fraudulent grantor; although he had notice that the con» veyance to his grantee was voluntary. This was a necessary provision; otherwise, all voluntary gifts would have been inalienable, at least during the life of the grantor; and such purchases from the fraudulent grantee have always been supported against subsequent purchasers from fraudulent grantor. These are the expressions in the books; though it is clear, that until the grantor sold to a purchaser, neither he nor the grantee could be guilty of any fraud, as to subsequent purchasers; and it might happen, that there never would be such subsequent purchaser.
But, as to fraudulent conveyances, to the prejudice of creditors, they were immediately void as to such creditors; and but for the proviso, the enacting clause might have avoided the deed made with intent to defiaud creditors, although that intent was confined to the grantor only, and was not known to the grantee. I do not, however, think that this would have been the effect, even of the enacting clause alone. The expression “ collusive,” can apply only to cases, in which both parties concurred in the fraudulent intent. However that might be, if the grantor and grantee bad colluded to defraud creditors, the conveyance would be absolutely void as to creditors; and the fraudulent grantee could not, but foi the proviso, have transferred ■ any title to a bona fide pu chaser from him. Nemo potest transferre ph s juris in alium quam ipse habet; and to guard against this consequence, was, I think, the chief object of the proviso. It provides for the validity of a conveyance to a bona fide purchaser for value, having no notice of the. covin, fraud, collusion or guile; such covin or *304 collusion, of which the purchaser was to have no notice, must, if it existed, have been between the original grantor and grantee. In case of a voluntary grant, considered as fraudulent as to a subsequent.purchaser, because voluntary, the purchaser from the donee, having notice that the deed was voluntary, would not, thereby, have notice of a fraud, as there could exist no fraud until there was a subsequent purchaser, which might never happen; and the Statute of the 27th Eliz. therefore dropped the expression in respect to purchasers without notice, found in the Statute of 13 JMiz.
Notice to the purchaser from the fraudulent grantee of property conveyed with intent to defraud creditors, was important. Such a purchase, with notice of the fraudulent intent, would be a fraud; because, it would tend to assist the consummation of the fraud, in prejudice of the known existing rights of creditors, who, but for such purchase, would be enabled to reach the property fraudulently conveyed. It was for this reason, that the proviso of the 13th Eliz. excluded from its benefit, purchasers with notice of the fraud, expressly; although the effect of the proviso would have.been the same, if this special provision, as to purchasers without notice, had been omitted. The former member of the proviso had only preserved the interests of bona fide purchasers for value; and a purchaser, with notice of the fraud, would not have been a bona fide purchaser, and so not within the proviso. This, I think, is the reason why the Legislature of Virginia, in transferring the substance of the two English Statutes into our Statute of Frauds' and Perjuries, has adopted the substance of the provisos of both the English Statutes, omitting that part of the proviso of the 13th Eliz. which speaks of purchasers without notice, as superfluous in the case of creditors, and improper in the case of subsequent purchasers. The proviso of our Statute is in these words: “This Act shall not extend to any estate or interest in any lands, &c. goods, &c. which shall be, on good consideration and bona fide, lawfully *305 conveyed or assured to any person or persons, bodies politic or corporate.”' The bona fdes required by this proviso, to exempt the conveyance from the operation of the Statute, seems, in its literal import, to be required from both the grantor and grantee; and this was' insisted on by the counsel for the appellee, as the true construction of the Statute. The same words were used in the Statute of the 13th of Elizabeth; yet, their generality was controlled by the subsequent words, in respect to purchasers without notice; according to which, the purchaser was protected, if he had not notice of the fraud of his own grantor; so that the bonafides was required only of the purchaser. And this last, I think, is the just construction of our Statute, which dropped the explanatory words to be found in the English Statute; because, as was before said, they had really no effect, in case of a purchaser under a conveyance to defraud creditors; and were wholly inapplicable, if not improper, in respect to that provision of our Statute taken from the 27th Eliz. in relation to conveyances intended to defraud purchasers.
Considering Garland then, as he really was, from the moment he assigned Leíais Nicholas’s debt to Wingfield and Coleman, and took their bond, as no longer a creditor of Lewis Nicholas, but of Wingfield and Coleman, and as being a purchaser from them, for the security of their debt to him; and, as having, as he really had, full notice of the fraud, and of the invalidity of their title. He could, upon general principles of equity, acquire no better right than they had; and upon the terms of the Statute, cannot be protected as a bona fide purchaser. Pie stands, to all intents and purposes, in their shoes.
Suppose, however, that to avoid the consequences of Garland’s claiming, as he does, as a purchaser from Wing-field and Coleman, for securing a debt due from them to him, with full knowledge that they had no title as against Nicholas’s creditors, we were, as it is contended we ought, to consider him as still virtually a creditor of Nicholas, *306 and virtually claiming as a purchaser from him, for the se-= curity of a just debt; what would be the effect ? Certainly, no more favorable to Garland than if, on the 18th day of January, (when all those indirect arrangements were made with his knowledge, and, so far as he was concerned, with his assent and concurrence) a direct lien had been given by Nicholas to Garland instead of Wingfield and Coleman, with an agreement between the parties, intended to have the very same consequences, which the arrangements actually made were intended to produce, and did effect. That agreement would have been this: that Garland should release a part of his debt, and give a credit of ten years, without interest, for the payment of the balance: that, not, withstanding this abatement and credit, he should take a deed of trust, falsely representing the whole debt to be due and immediately payable, subjecting the whole of Nicholas’s property, down to the last mouthful of meat and bread, to immediate sale for cash, upon ten days notice at the court-house door only: that at this sale, Wingfield and Coleman should purchase to the nominal amount of the debt, and discharge the portion of the debt agreed to be paid at the erld of ten years without interest: that this sale should be made immediately, to avoid the effect of the lien of Nioes’s judgment, expected to be rendered in the first week in the succeeding March; and suppose this agreement were carried into effect, the sale made, the whole property purchased by Wingfield and Coleman at about half its cash value, and that, in effect, upon a credit of ten years; and Garland to have retained the lien on the land given to him by Nicholas, claiming under it only the sum agreed to be paid at the end of the ten years. In that case, the parties would all have been substantially, in the condition in which they now are: Nicholas without property; Wingfield and Coleman claiming all that was his,‘'subject to a lien on the land for % 13,000, payable in ten years, without interest; and Garland claiming a lien for the same debt, and upon the same property, as he now claims; with this only dif *307 ference, that he would, in that' case, claim under a deed from Nicholas, who had a title to convey, instead of claiming under Wingfield and Coleman, who have no title, and coujd convey none to him. In such a case,’the fraud of Nicholas and Wingfield and Coleman would have been just as palpable, and no more so, than it is in the ease which has occurred; and Garland would not only have had the same notice of, hut would have been a direct actor and participator in, the fraud, a party to the covin and collusion, and could not be held to be a bona fide purchaser under the proviso of the Statute. In any point of view in which I can consider this case, I see no ground upon which to hold that Garland has any legal title to the land in question.
It is however insisted, that although Garland’s trustees have no legal title, which they could assert in a Court of Law against that vested in the Sheriff by operation of law, for the benefit of Rives, or the lien of Rives’s judgment and Ca. Sa. executed; yet, when the latter applies to a Court of Equity to aid in enforcing his legal rights, that Court, upon its general principles, will not assist him, further than by subjecting the property to Rives’s claim, after first satisfying Garland; and various classes of cases supposed to be analogous to this, aré referred to, as illustrating the principles upon which a Court of Equity acts in such cases.
Before I examine the cases relied on as to this point, I premise, that a Court of Equity, in all cases of actual fraud, has a concurrent jurisdiction with a Court of Law, in remedying the fraud; and the remedy in equity is frequently more beneficial than at law, by means of its power to compel discovery, and to cause fraudulent deeds and securities to be cancelled, or conveyances to be made; thus effectually putting an end to future litigation. In these cases of actual fraud, equity follows the law, and gives relief to the full extent to which a Court of Law could give relief. Bennet v. Musgrove, 2 Ves. sen. 51; a case which will be more *308 particularly adverted to hereafter. The case under consi» deration is a case of actual fraud, and a strong case; in which, if Garland, was not a party, he is a purchaser withfub notice, from Wingfield and Coleman, who were the chief actors in the fraud; and I believe there is no exception to the rule of equity, that a purchaser with notiee, stands, in all respects, in the shoes of his vendor. Eives, therefore, comes into a Court of Equity, ex debito justifies, not appealing either to the favor or discretion of thé Court.
The invariable maxim of equity is, that he who askg equity must do it. But, this maxim is confined exclusively to the cases, in which there is an equity between the parties; where, although the plaintiff is entitled to relief, he yet owes, in' conscience, (though possibly not at law) a debt or duty to the defendant. Francis’s Max. 1. In such cases relief is given, on the condition, that the plaintiff does, « hat in conscience he' is bound to do, to the defendant. An ..equity which any third person may have against the plaintiff, can never be available, under this maxim, to the defendant.
In this case, neither Garland, nor any other, has any equity against Eives: Between two creditors engaged in a race of diligence, in seeking a prior right to satisfaction out of the debtor’s property, there can be no equity. It is the tabula in naufragio ; and-he who obtains th& prior legal right to satisfaction, must prevail, both at law and in equity. Where the equity is equal, the law shall prevail.
To this maxim, that he who asks equity, must do equity, to the person from whom he asks it, are to be referred very many of the cases cited in the argument; as, the cases of conveyances, bonds or judgments, or any other securities obtained by fraud; the cases of usury and annuities, in which the securities are void by Statute. In such cases, the plaintiff, who asks the aid of a Court of Equity to relieve him against the vitious security, is bound, in equity and conscience, to refund to the defendant against whom *309 he seeks relief, the real consideration which he has received from him; and it is upon that condition, that relief is given.
Another class of cases relied upon, is that which shews the extent of favor shewn by a Court of Equity to creditors, and bona fide purchasers without notice. These cases cannot apply here. Garland is not a bona fide purchaser without notice; and although a creditor, so is Rives, both equally entitled to favor. There is no instance, in which, as between creditors, he who has obtained the legal advantage, has not prevailed.
The next class of cases insisted on, is that in which it has been held, that a conveyance to several grantees may be void as to one, and good as to another; as in case of a marriage settlement, in which interests are given to those who are strangers to the consideration. The deed would be good as to the wife, and all coming within the considerations of the deed, but void as to all the rest, so far as creditors are concerned. The wife would be a bona fide purchaser for value; the strangers, mere volunteers. So, if a deed be made to secure a just debt, and the equity of redemption is reserved to a stranger, or to the family of the debtor; such a deed would be good as to the creditor, and void as to the reservation of the equity of redemption. In such cases, the limitations to volunteers are void, not because there is any actual fraud, but because of the want of valuable consideration. The wife or creditor, in such cases, might not know that the grantee had any fraudulent intent; as he might not in fact, and they would have no concern in the disposition of the surplus interest of the grantor. But, if the creditor, in such case, were to concur in any actual fraud, with intent to frustrate, the rights of other creditors, as in lending his aid, in any way, to give colour to any consideration, falsely alleged, as the inducement to such a reservation of the equity of redemption, such his concurrence in the actual fraud of the grantor, would avoid his deed, as to the creditors intended to be injured thereby.
*310 To this class of cases, may be referred those cases, in which a husband stipulating to settle on his wife, a just equivalent for her right of dower relinquished, with a view to defraud his creditors, settlés property grossly exceeding in value the dower, in which case it has been held, that the deed was valid, so far as to secure the just equivalent, and void as to the surplus. In these cases, the wife is held to be an innocent and bona fide purchaser, to the extent of the value of the dower-right relinquished, and the fraud of the husband is not imputed to her. But, if she were sui juris, and concurred in the fraud, the deed would he wholly void, under the Statute of Frauds and Perjuries.
It is lastly asserted, that there is another class of cases, in which, when it is doubtful, whether the conveyance impeached, was or was not founded in an actual fraud and collusion, to defeat or delay creditors, a Court of Equity will take a middle course, and allow the deed to stand as a security for the money really due, and give to the creditor the surplus; and a decision of Chancellor Kent of New York, to this purpose, is cited. Boyd v. Dunlop, 1 Johns. Ch. Rep. 478.
With great and habitual respect for the opinions of this distinguished Judge, after examining the authorities which he cited, and those cited in the argument of this cause, I cannot think that the principles asserted in that case, are supported by precedents, or sanctioned by any just reasoning-
If the conveyance is impeached upon the ground of actual fraud, intended to defeat or delay creditors, and the allegation of fraud is supported by proofs, the deed ought to be set aside in tofo, and cannot stand as a security for any purpose of reimbursement or indemnity. Sands v. Codwise, 4 Johns. Rep. 536, 598, 599. If it be not supported by proof, I can see no ground, why the Court should deprive the defendant of the benefit of an advan-_ tageous purchase, fairly made, so far as respects the creditors, upon the mere suspicion, that a fraud upon creditors was intended.
*311 There seems, however, to be another ground of equitable jurisdiction in favor of creditors, independent of the Statute of Frauds. When a purchaser takes advantage of the circumstances of a necessitous debtor, to purchase his property at a great sacrifice, without any intention to frustrate the claims of his creditors, for the benefit of the debtor or his family, but for the sole purpose of benefiting the purchaser; and the circumstances are such as would induce a Court of Equity to relieve the vendor; in such a case, a judgment creditor, standing in the shoes of the debtor, independent of the Statute of Frauds,' would be entitled to the same relief that the debtor would be entitled to, and could only be relieved upon the terms of paying out of the property or otherwise, what the debtor justly owed, upon the principles before discussed. The relief is founded in these cases, not on a suspicion of fraud practised with intent to injure creditors; but on the fraud practised on the debtor himself to his own prejudice; and that satisfactorily proved.
The only eases cited in Boyd v. Dunlop, bearing upon this point, are Herne v. Meeres, 1 Vern. 465. 2 Bro. Ch. Cas. 177, note S. C. and Bennett v. Musgrove, 2 Ves. 51. All the other cases, (How v Weldon, 2 Ves. 516, Proof v. Hines, Cas. Temp. Talb. 111. Grove v. Watt, 2 Sch. & Lefr. 492, &c.) are cases in which the grantor sought relief against his own contract, and.was subjected to, equitable terms. The case of Barwell v. Ward, 1 Atk. 260, was cited in the argument as bearing on the same point. These cases are all (as far as I am informed,) that are to be, found in the English books, affecting this question.
The case of Herne v. Meeres, was decided in 1687; that of Barwell v. Ward, in 1744; and that of Bennett v. Musgrove, in 1750; and in the last case, I have no doubt Lord Hardwicke, who decided Barwell v. Ward, intended to state distinctly the grounds upon which those cases were decided.
*312 The case of Bennett v. Musgrove, was this: A bill by a judgment creditor, who had an elegit executed, to set aside a fraudulent conveyance made by the debtor to the defendant. Two objections were taken; that a Court-of Equity had no jurisdiction, as the plaintiff had a remedy at law; and that there was not sufficient evidence of fraud. Lord Hardioicke said, “A plain case to give the plaintiff relief, which is, to be let in to the benefit of that, to which such a creditor is entitled, though a creditor at large is not. But, when a judgment is obtained affecting it from the time, and' execution, he is entitled, because that affects the realty of the land, and this, whether it be one kind of fraudulent conveyance, or another. For, if it is by collusion, he clearly may ; but, if it was obtained from his debtor himself, by fraud on the debtor, on os about the time he obtained his judgment and elegit, he might, AS STANDING IN THE PLACE OF THE DEBTOR, Come into this Court to be relieved against that conveyance, and to have the same benefit of relief,” as the debtor, I presume, might have had. The Lord Chancellor proceeded to declare, that the Court had jurisdiction in a case of actual fraud, whether the plaintiff could recover, or not, at law. And notwithstanding the consideration, specified in the deed, of 501. a debt due to Musgrove, he set aside the deed, so far as it interfered with the plaintiff’s right, under his elegit, the utmost extent to which a Court, either of law or equity, can give relief un’der the Statute of Frauds. The deed is void, only as to the creditors. After they are satisfied, the surplus belongs to the grantee.
Herne v. Meeres, as reported in Vernon, is to this effect: The bill was by creditors of Cox against Meeres. Cox was outlawed and absconded. Meeres purchased from Cox, wilh notice of all the facts, a life-estate at three or four years purchase. The creditors, afterwards, obtained a judgment, and filed their bill to be relieved against this purchase as a trust, or else as a fraud, it being at a great under value. The Court is reported to have said, “The *313 purchase is at a great under-value, and huddled up in haste, ata time when young Cox concealed himself from his ereditors, and carries another ill circumstance with it, that the defendant is a trustee in the marriage settlement; and for him to buy the life-estate of the husband, was to take away the maintenance and support thereby intended and provided for the wife and children, on whose behalf he was entrusted, and all this, with notice of the plaintiff’s debts, and proceedings at law, which ought to have some weight in the case; and although the plaintiff’s securities were not such as did immediately affect the land, yet the notice was such, and Cox’s absconding, had he been a trader, would have made him a bankrupt, and then the defendant must have lost all his money; and so, at law, when a conveyance is found to be fraudulent, the creditor comes in and avoids all, without the re-payment of any consideration money; and in equity, therefore, when the Court can decree back the principal and interest, there is no hurt done, and a lesser matter in such a case will serve to set a conveyance aside.”
It is difficult to extract from this reasoning, the principle on which relief .was given. There is no intimation of any suspicion of a collusion to defraud the creditors. The reference to the trust, the inadequacy of price, and the distressed circumstances of Coa;, would tend to shew, that the transaction was a fraud upon Cox, against which he might be relieved; and the terms of the decree, as stated from the register in 2 Bro. Ch. Cas. 177, (n.) seem to place the relief on that ground. It states, that “the bargain made by Sir T. Meeres with Cox, was not fairly obtained, in respect of the circumstances Cox was in; but ought, in conscience, to be made void, the premises purchased by him, being more than double the value of the money paid by him, and therefore he should be considered as a mortgagee.” I think this case proceeded upon the principle stated by Lord Hardwiclce, in Bennett v. Musgrove; the substitution, in equity, of a judgment creditor, to the right *314 of. his debtor to impeach a conveyance, for a fraud prae* tised upon him. The circumstances under which the conveyance was procured, were such, as that in equity, Meeres was a trustee fqr Cox; and this equitable right of Cox might be pursued in equity by a judgment creditor; as such a creditor might, in the case of a mortgage, claim, in equity, the benefit of the debtor’s equity of redemption.
The case of Barwell v. Ward, decided by Lord Hardwicke, in 1744, was this: The defendant’s brother conveyed to her the moiety of a reversionary estate, for less than half its value; and in a month after, was committed to jail, and became bankrupt by failing to give bail, for two months. By the Chancellor: “The present is a plain case, and appears to be a fraudulent conveyance to cover the estate, for the deeds were executed when Ward was in declining circumstances.” “No more than 60/. paid for the moiety of an. estate in reversion, of the value of 39/. a year, which is pretended to be redeemable upon the payment of 60/. but no clause of this kind is in the deed itself; for, it is an absolute bargain- and sale. The Court in this case, ought to do no more, than to let the deed stand as a security for the' money really and bona, fide advanced;” and accordingly ordered an enquiry as to the amount. It iá difficult to ascertain, from the report of this case, upon what principle the Court proceeded, if not upon this: that the assignees were entitled to assert the rights of the bankrupt, and asserted their claims in that character; and that the conveyance was admitted by the defendant to be redeemable.
If, however, the rule laid down in Boyd v. Dunlop, as deduced from those cases, be the true rule, then this case does not fall within the rule; since it is a clear case of actual and gross fraud in Wingfield and Coleman; and Garland is a purchaser from them, with full notice of the fraud and invalidity of their title. If the rule I have gathered from those cases is the true rule, then there was, in this case, no fraud or imposition on Lewis Nicholas, of which *315 he could complain; and, consequently, the rule is not applicable to this case.
Upon those scanty and equivocal materials, vve are urged to sanction the doctrine, that a Court of Equity will allow a party to advance his money, with a view to enable a debt- or to secure to himself or his family, fraudulently, all his property against his creditors, except what may be necessary to re-pay the money advanced; or, a creditor to permit his debt to be used in like manner; and when the fraud is detected and exposed, to suffer the deed, declared by the Statute to be utterly void as to creditors, to stand as a security to their prejudice, for the money advanced or the debt due. So, that the experiment would be made, without hazard to any party concerned. This, I think, would be to repeal the Statute. It would offer the greatest temptation to such fraudulent experiments; and the delay, at least, which is commonly one of the principal objects of such transactions, would be effected without loss to the parties concerned in the fraud.
The only enquiry which remains to be made, is, whether it be competent for the appellant to impeach the judgment, on which the appellee’s claim is founded, on the ground that the original transaction was usurious; and if he can, and should succeed in impeaching it, whether Rives’s claim would be thereby wholly avoided, or relief given for the usurious excess only.
It seems, from the case of Scott v. Nisbett, 2 Bro. Ch. Cas. 640, that a plaintiff, coming into a Court of Equity, and claiming by force of a judgment at law, any third person, affected by the judgment, may resist the plaintiff’s claim, upon the ground that it is usurious, if that question had not been tried and decided at law; and in such ease, the Court of Equity will adopt the same rule, that prevails when the usurer is a defendant in equity; relieving only as to the usurious excess. It is, however, unnecessary to examine these doctrines.
*316 In this case, Hives’s suit was depending, and eagerly-prosecuted, at the time that the conveyances were executed for the purpose of defeating the fruits of his action. The suit was defended on the plea of usury; and every fact, upon which it is now sought to establish the charge of usury, was submitted to the Court of Law and the jury, except only the negotiations between Rives and Nicholas, respecting a purchase of lands, which appears in Hives’s answer to the cross bill; but in such a form as not to affect the question of usury.- The deposition of Wilson C. Nicholas was properly excluded in the trial at law, and is not evidence in this cause. Upon the question, whether one is or is not a debtor, an adversary judgment against him is evidence prima facie, that he is a debtor, even as against strangers, who claim, under him, property affected by the judgment. If they attempt to impeach the judgment, it must be done on the ground of fraud, or by shewing that a full defence was not made, and producing new proof, shewing that the debt is not due. But, in a case like this, of a purchase pending the suit, and for the purpose of fraudulently defeating the objects of the suit, it seems to me, that the purchaser ought to be bound by the judgment, as the debtor was bound.
If a Court of v Equity could, in this ease, pronounce this transaction usurious, upon the very same facts, on which the Court of Law and jury have pronounced it not to be usurious, then it would virtually be an appeal from the Court of Law to the Court of Equity; and the Court of Equity would re-examine the judgment of the Court of .Law, and virtually reverse it. This is not within the jurisdiction of a Court of Equity; which relieves against judgments at law, not because they were wrong, but because of some new matter, which the Court of Law did not, or could not, pronounce a judgment on, or which, for some just cause, the party could not bring to the consideration of the Court of Law. Whether the transaction in question, was a loan or a sale, was emphatically proper for the *317 decision of a jury; and a jury having decided that question, upon the very same evidence now submitted to a Court of Equity, that decision is conclusive, although we might differ in opinion from the jury, as to the effect of the evidence.
Upon the whole, the decree is right, and should be affirmed.
Judges Carr and Coalter concurred, and the decree was affirmed.*