## ANDREWS & BROTHERS v. JONES, ET AL.

1. It is competent for a party to make a fair sale of his property, either for cash or on time, to any one competent and willing to contract; and it cannot be assumed, because the purchaser has not the means of payment, independently of the property thus acquired, the sale was fraudulent, if the vendor has taken a mortgage or other form of security for the purchase money.

2. *Semble;* where parties make an exchange of promissory notes, or other securities for money, they may stipulate *bona fide,* for an allowance of a *premium* by one to the other.

3. It cannot be assumed that property was purchased at less than its fair value, because the purchaser, after having improved it, has realized a large profit from the investment; and if a sale is made for a valuable, though inadequate consideration, in good faith, it will not be defeated either by the common law, or the statute of frauds.

4. Where slaves are publicly sold, under a deed of trust, it cannot be inferred that the sale was fraudulent, because they remained upon the plantation, where they were previously employed for several years afterwards—the vendee occupying the plantation under a contract to pay rent.

5. Where the lessor of land, under an impression that the rent reserved was too much, originally, or because the year had been unfavorable to planting, remits half the rent, it cannot be assumed that the transaction was fraudulent, and that the remission of rent was simulated, or intended as a gift to the lessee.

6. Where a defendant in chancery, in answer to a bill, affirms that an account, or written security for money has been settled fairly, that nothing is due, or uses equivalent terms, it must be understood that it has been paid, or at least released.

7. *Semble,* where an answer is responsive, but not as precise and explicit as the complainant desires, exception should be taken in the primary court.

Andrews & Bros. v. Jones, et al.

8. Contracts entered into between a guardian and his ward, in respect to the estate which the former had managed, shortly after the ward attained her majority, are looked on with suspicion, but where there is no evidence of an intention to delay, hinder or defraud the creditors of the ward, they cannot successfully impugn it, upon the ground that it was unequal and prejudicial to the latter.

9. It is competent to show by parol evidence that one acted as the agent of another, in the purchase of lands, paid for them with the money of his principal, and took a title in his own name, in such case there will be a *resulting trust* in favor of the principal, and in a controversy between him and the creditors of his agent, he will be entitled to the lands, or their proceeds if they have been sold.

10. *Semble*, that verbal agreements entered into before marriage to convey property, or make a settlement in consideration of the marriage, cannot be enforced.

11. If a verbal contract has been executed, it cannot be avoided, merely because the statute of frauds requires such contracts to be in writing.

12. To make an ante-nuptial settlement void as a fraud upon creditors, it is necessary that both parties should concur in, or have notice of the intended fraud.

13. In legal effect, marriage is a gift to the husband of all the wife's chattels in her possession, and of her choses in action, if he reduce them into possession; if the choses are not reduced into possession by the husband during coverture, they remain the property of the wife, on the dissolution of the marriage.

14. The husband cannot, in virtue of his marital rights, be considered a purchaser of the equitable interests, or choses in action of the wife; consequently, these cannot be subjected in a court of equity by the creditors of the husband to the payment of their demands.

15. Where an adult daughter, in contemplation of marriage, joins with her intended husband, in relinquishing her entire estate to her mother, who was its guardian, and in possession of it—there being no evidence to impugn the *bona fides* of the transaction, and the daughter and husband declaring their determination to abide by it, the release cannot be set aside at the instance of the creditors of the latter, and the estate made chargeable to them.

16. A court of chancery will not allow the husband to recover the equitable estate of the wife, without making such provision and settlement for her benefit, as may be proper under all the circumstances.

Writ of Error to the Court of Chancery sitting in Dallas.

In September, 1842, the plaintiffs in error filed their bill,

alledging that they had recoved judgment at the spring term of the circuit court of Dallas, holden in 1841, against George J. S. Walker, for the sum of $14,094 16, and John V. F. Walker, for the sum of $14,177 78, with costs against each of these defendants. These judgments, though separate, were rendered upon the same debt, and are still in full force and unsatisfied. In May, 1841, *fi. fa's* were issued on each, and delivered to the sheriff of Dallas, and returned "no property found."

In June, 1842, *alias fi. fa's* were duly issued, returnable to the then next term, but the sheriff does not know on what to levy them, without hazarding a liability to third persons, and therefore declines to levy the same. The defendants in the judgments profess to have no visible property, and have so artfully and deceitfully arranged their respective interests, as to hold no property in their own names. Complainants are informed, and believe, that they have equitable interests in choses in action, and things real and personal, to an amount exceeding the judgments; which, by means of fraudulent conveyances and other arrangements with their relatives, complainants cannot discover and reach by execution.

About the 26th June, 1836, the defendant, Geo. J. S. was the legal and equitable owner of divers tracts of land, (particularly described,) which he sold to his cousin Geo. A. B. Walker, for the real or pretended sum of $25,000. The vendee executed a mortgage to the vendor to secure the purchase money, by instalments of $5000 each; the first of which was payable on the 15th May, 1838, the others in four annual payments thereafter. The deed by which the title was conveyed to the vendee and the mortgagee were both recorded in the county court of Dallas.

Afterwards, a pretended agreement was entered into between Geo. J. S.; Geo. A. B., John V. F. and Mrs. Elizabeth Jones, the aunt of the first and third named individuals, and the mother-in-law of the latter. The purport of this agreement was, that Mrs. Jones, either alone or in conjunction with her son-in-law, should have the possession and management of the land, and be the ostensible owner thereof—that the notes of Geo. A. B. should be cancelled under the pre-

tence that she had taken them in satisfaction of a pretended debt from Geo. J. S. to her. While it is alledged no such debt in point of fact existed, nor was any consideration *bona fide* paid for the notes; but the true object of the arrangement was to place the lands beyond the reach of the creditors of Geo. J. S. and John V. F.—both of whom profess to be, and are reputed insolvent.

There is no conveyance of these lands by Geo. A. B. to Mrs. Jones, or any one else, to be fuund of record, though five years have elapsed since the pretended transaction; it is therefore charged that none has ever been made, and that the lands are held, eithcr by the vendee or Mrs. Jones, under a secret trust for Geo. J. S., or John V. F., or their families.

It is further alledged, that Mrs. Jones, at the time of the pretended purchase of land, and previously, " was in very moderate circumstances," utterly unable to pay for the lands referred to, or any considerable part of the largo masses of property which she professed to purchase, or to lend the money, or in any way to become a creditor to any considerable amount.

In June, 1837, Geo. J. S. executed a deed, in which J. A. Campbell is trustee, and Daniel Chandler and John V. F. are designated as *cestuis que trust*, by which about fifty-five slaves, of different descriptions, sexes, &c., are conveyed to the trustee; this deed is of record in the couuty court of Dallas, and is referred to as an exhibit. It confers upon the trustee, in default of payment of the sum therein mentioned, power to sell the slaves conveyed, to satisfy the professed objects of the trust. Afterwards, and after some form of notice a sale was made of the slaves, at a plantation of the grantor, called the " Belvidere," situate in Dallas county; at that sale, the trustee was absent, and the execution of the trust was superintended by Daniel Chandler; Geo. J. S. and John V. F. were present, consulting, &c., that the latter bid off all the slaves that were sold, about fifty, under the pretence that he was purchasing them for himself, or Mrs. Jones, or both of them. This sale was made at an unusual and unreasonable season of the year, which caused distrust in its fairness, and prevented competition to any great extent; besides

this, but little if any money was paid upon account of the purchase.

Complainants alledge, that the debts for which the deed of trust professes to provide, were not really and *bona fide* due, or if to any extent, only a small amount in favor of Daniel Chandler; and that the execution of the deed, the subsequent sale, &c., was a concerted scheme of Mrs. Jones, and her son-in-law and nephew, to defraud the creditors of the two latter.

Up to the first of January, 1841, the slaves conveyed by the deed of trust remained upon the plantation of Geo. J. S. where they had previously been employed, when that plantation having been sold, under a further arrangement with Geo. J. S., John V. F. and Mrs. Jones, they were removed to the other lands described in the bill, and are still there employed under the direction of Geo. J. S. and John V. F.; although the slaves and these lands are protected from execution for their debts, by the pretended ownership of Mrs. Jones.

It is also stated, that Geo. J. S. in August, 1836, was the proprietor of sundry tracts of land, situate in Dallas county, (all of which are particularly described in the bill,) and by deed dated in that month and year, bargained, sold and conveyed the same to his brother, Laird M. H. Walker, for the real or pretended consideration of $25,000. About the same time the pretended vendee made his five promissory notes of $5,000 each, payable on the 15th day of May, 1838, 1839, 1840, 1841, and 1842, and executed a mortgage upon the lands conveyed to him for their payment. Laird M. H., it is alledged, was a young man of very limited means, and but a small portion, if any, of the purchase money has been paid; that if any payment has been made, it has been received by the vendor, or Mrs. Jones, for his use; notwithstanding all this, the debt of the vendee has been cancelled, and the notes and mortgage is held by Geo. J. S. or Mrs. Jones, "in secret trust for himself and family."

Further; at or about the time of the conveyance of the land last aforesaid, Geo. J. S. with the view of defrauding his creditors, conveyed to Laird M. H. for a price unknown, thirty or forty slaves.

Complainants alledge, that Geo. J. S. and John V. F. are

equitable stockholders, or part owners of the warehouse and cotton press, the location of which in the city of Mobile is particularly described; but the legal, or ostensible title to all or a large proportion of this property, is in the name of Mrs. Jones, for the purpose of applying the same to the use of the equitable owners, and protecting it against their creditors.

It is further charged, that Geo. J. S., either alone, or conjointly with John V. F. sold some slaves, other than those referred to, to their cousin, William Clayton, for a mere pretended price, agreed to be paid by the vendee to the vendor. This transaction is alledged to be fraudulent, and intended to secure the slaves, or their value, to the vendors, and thus hinder and delay their creditors, in the collection of their debts.

The defendant, J. V. F. W. intermarried about six years ago, with Eliza, the daughter of Mrs. Jones, and in virtue of his marital rights, is entitled to legal and equitable interests in real and personal estate, things in action, money and bank stock; all which are held and controlled by Mrs. Jones, or some one else, and the rents and profits received and appropriated to the use of J. F. V. W., or his family.

It is charged generally, that G. J. S. W. and J. V. F. W., have other property and interests within the jurisdiction of the court, justly liable to the payment of their debts, which the complainants cannot particularize, and therefore pray a discovery. G. J. S. W., J. V. F. W. and wife, L. M. H. W., G. A. B. W., William Clayton, and Mrs. Jones, are all made defendants.

The bill prays an account of what is due the complainants upon their judgments; that the defendants, in whose possession there may be any part of the estate, &c. of G. J. S. W. and J. V. F. W. subject to their payment, may be decreed to satisfy the judgments, and in default thereof, then every thing that may be liable to their payment, be so disposed of that the same result be produced. That a receiver be appointed, &c.; and such other and further relief as may be appropriate, and adapted to the case.

The defendants severally answered at length the material allegations and interrogatories proposed to them by the bill;

and upon these answers, and the proofs and exhibits of the respective parties, the cause was heard. But as they are recited in the opinion of the court, as far as may be necessary to the understanding of the questions considered, they need not be here repeated.

R. SAFFOLD, with whom was G. W. GAYLE, for the plaintiffs in error, made the following points :

1. The equity of the bill is clearly defensible upon the ground, that the complainants have exhausted their legal remedies by judgment and execution, and the defendants in the judgments have equitable interests and property held by others which is liable to the payment of their debts. [3 Paige, 506 5 Id. 274; 2 Hoff. Chan. Pr. 118, 119; – Johns. Rep. 554 ; 4 Rand. Rep. 283, 310, 315; 2 Brock. Rep. 285, 292, note ; 1 Paige's Rep. 305, 637 ; 2 Mason's Rep. 252 ; 2 Stew't R. 378 ; 5 Ala. Rep. 334 ; 7 Id. 926 ; Hill's Ch. Rep. 297, 303.]

2. The possession of a guardian is the possession of his female ward, and upon the marriage of the latter vests in her husband *eo instanti*. [8 Porter's Rep. 36 ; 4 Ala. Rep. 350 ; 1 McCord's Reports, 191, 195 ; 2 Nott & McCord's Reports, 151; 2 Murphey's Rep. 351; Clancy on Rights, &c. 23, 443 ; 1 Wms. on Ex'rs, 556, 564 ; 2 Id. 811 ; 12 Pick. R. 173-5; 1 Bailey's Rep. 320 ; 7 Ala. Rep. 32, 589; Roper on H. & W. 220, 221, 307 ; 1 Penn. Rep. 373 ; 2 Serg. & R. 491; 14 Id. 64.]

3. The guardian or other trustee cannot purchase of the ward or *cestui que trust*, during the continuance of the trust, or shortly after its determination ; especially if there is a failure to disclose, or a concealment of the value of the estate or interest. [1 Mad. Ch. 111, 112 ; 1 McC. Ch. 389 ; Hopk. Ch. Rep. 515; 10 Ves. Rep. 292 ; Story's Com, on Eq. §§ 317 to 320, 322 ; 5 Ala. Rep. 90.]

4. Assent of a parent or guardian to the marriage of a child or ward is not a valid consideration for the waiver or transfer of the rights of the latter. [1 Story's Com. on Eq. §§ 260 to 267, 280 to 282; 1 P. Wms. Rep. 118, 121 ; Ather. on Mar. Set. 126, 132 to 134, 148, 149, 170, 173, 176, 180, 182, 213, 214, 220, 227, 259, 260.]

Andrews & Bros. v. Jones, et al.

5. Verbal marriage contracts are void by the statute of frauds. [Roper on H. and W. 307.]

6. If a guardian mingle his own and ward's funds, and invest them in trade, the ward or a creditor of the latter may insist upon a return of principal and interest, or to a proportion of the profits, without a deduction for losses for insolvencies, &c. [2 McC. Ch. Rep. 214, 264, 5, 7; 2 Johns. Ch. Rep. 62; 1 Paige's Rep. 393; 1 Story's Eq. 312 to 315; 2 Id. §§ 1270-3-4-7.8; Lewen on Trusts, &c. 290; 2 M. & K. Rep. 655.]

7. The bill is not multifarious—it has but a single object, the satisfaction of the complainant's judgment; which it is insisted has been prevented by fraudulent transactions, in which all the defendants are implicated, though perhaps in unequal degrees. [Story's Eq. Plead. 233, and notes, 409 to 410; 4 Cow. Rep. 682; 3 Paige's Rep. 100; 5 Id. 77; 7 Id. 56; 2 Hoff. Ch. Prac. 121; 3 Ala. Rep. 90, 92; 5 Id. 339. 7 Id. 926.]

8. Much of all the answers is in avoidance, and should be sustained by proof, for they cannot be regarded as evidence against the complainants. [2 Johns. Ch. Rep. 62: 1 Cow. Rep. 743; 2 Stewt. Rep. 280; 2 Ala. Rep. 215.] Although the answers are put in issue by the complainants, they are not precluded from making their case by the defendants' admissions; the law only requiring that when they read part of a passage, the whole should be evidence. [1 Smith's Ch. Pr. 340.] A response to the stating or charging part of the bill alone, is evidence. [3 Ala. Rep. 478; 4 Id. 60, 64.]

9. Under a prayer for general relief, complainant is entitled to any relief consistent with the case made out. [1 John. C. Rep.117; 12 John. Rep. 494; 4 Id. 554; 1 Paige's Rep. 637; 3 Id. 320; 7 Id. 163, 166.]


J. A. CAMPBELL for the defendants in error, contended, that the answers were responsive to the bill, and denied every material allegation, both general and special, the bill was so indefinite and inquisitorial in its statements, charges and interrogatories, that the answers were evidence, not only so far as they professed to be a denial of matters affirmatively alledged, but even where they affirmed or avoided. Taking the

case as presented by the record, and the conclusion was perfectly just, that J. V. F. Walker was the agent of Mrs. Jones in all the transactions of his which are brought to view by the bill and answers ; that G. J. S. W. was indebted to Mrs. J., as shown by the answer of both of them, and that this indebtedness was settled with her by the transfer of the notes of L. M. H. W. and G. A. B. W., and the purchase of slaves at the sale, under the deed of trust. There is nothing in the record to impugn the validity of the several sales of land to G. A. B. W., of land and slaves to L. M. H. W., or of the deed of trust to J. A. Campbell, or proceedings thereunder. And in respect to the transaction between G. J. S. W. and Clayton, there is still less room for controversy.

The antenuptial agreement between Mrs. J., her daughter, and son-in-law, must be assumed to have been fairly made, and not intended as a mere cover to defraud the husband's creditors. Here then an agreement has been made, acted upon, and still recognized by the husband and wife. The marital rights of the former never attached—they were repudiated by him, and if ever made available, it must be by some new act. Even the receipt of money, if not received in the character of husband, and with the view of appropriating it as such, is not sufficient to confer a title. [12 Ves. Rep. 497 ; 16 Id. 413 ; 17 Mass. Rep. 57 ; 11 Sergt. & R. Rep. 325.] If this agreement can be avoided, it must be by some proceeding at the instance of the husband and wife, seeking an account against the guardian of the latter. An order of the court of chancery is necessary to confer upon the husband the wife's estate. [Clancy on Rights, &c. 119.]

The husband's right to the wife's choses in action merely entitles him to reduce them into possession ; but if he fails to exert any power over them, they remain the wife's, unincumbered by the fact of eoverture. They are not liable to a set-off, which would be good against the husband. [10 Ves. R. 574.] Nor to an unexecuted agreement to discount from them a debt of the husband ; and they will not be charged with his debts, though he has united with the wife in obtaining a judgment. [1 Rawle's Rep. 452.]

True, if the wife's estate is a legal one, he may assign or transfer it ; if equitable, it is subject to her right to a settle-

ment. But a husband cannot be compelled to exert his power over the wife's estate for the benefit of creditors. [2 Hovenden on Frauds, 227 ; Sugden on Pow. 592 ; 12 Ves. R. 206 ; 4 Rawles' Rep. 468 ; 2 Brock. Rep. 286 ; 4 Metc. R. 486 ; 6 Id. 537 ; 2 Bailey's Rep. 477 ; 5 B. Monr. Rep. 31 ; 2 Watts' Rep. ——.] Property in the hands of a guardian is in the same condition as it respects the husband's constructive possession, as if it were in the hands of an executor. In neither case will the law presume the husband, without any act on his part, immediately upon marriage, to be in possession of the wife's estate. [1 Rand. Rep. 355 ; 5 Johns. Ch. Rep. 464 ; 4 Paige's Rep. 65 ; 3 J. J. Marsh. Rep. 215 ; 7 Monr. Rep. 246 ; 3 B. Monr. Rep. 400.]

Conceding that the agreement was invalid, yet it was executed before the complainant's debt was created, and they cannot object to it. [3 Ala. Rep. 458.] The cases cited by the plaintiff's counsel from the early volumes of Pickering are overruled. [See 20 Pick. Rep. 517.]

The right which the plaintiffs are pursuing, can, at most, be nothing more than an equity of the wife—her money, which has been vested in property. [See 8 Eng. Cond. Ch. Rep. 172.] None of the statutes, in respect to fraudulent conveyances, lend any aid to the proceeding. [Roberts on Fr. 463 ; 1 Dana's Rep. 506 ; Cro. Car. Rep. 550 ; 12 Pet. Rep. 198.] All the parties to the agreemont being competent to act, and having acted with good faith, it cannot be declared null.

COLLIER, C. J.——We have given to the very voluminous record in this cause, a searching and laborious examination, and for the sake of perspicuity propose to consider the case made by the bill and proof, in respect to each of the defendants, who are charged with having assisted G. J. S. Walker and J. V. F. Walker in defrauding their creditors. It may be premised that the statements, charges and interrogatories are so minute and comprehensive, that the answers are, for the most part, responsive, and unless overcome by proof, are evidence for the defendants. Each of the respondents disavow, in general and unequivocal terms, the imputation of fraud, deny that they hold any thing under a " secret trust, or other-

wise," for the benefit of either of their co-defendants to the judgments at law, or their families, and state with particularity, the several transactions which are drawn in question.

The allegations in respect to the conveyance of land by G. J. S. Walker to L. M. H. Walker, are fully explained in the answers of both of them, in such manner as to make it necessary for the complainants to prove that these defendants or either of them, meditated a fraud. It is certainly competent for a party to make a fair sale of his property, either for cash or on time, to any one who may be capable of contracting, and willing to do so ; and it cannot be assumed, because the purchaser has not the means of payment, independently of the property thus acquired, that the sale was fraudulent. We all know that it is not unusual for the benevolent to assist by their credit, those who are esteemed trustworthy, without reference to their present means of payment ; and sales, especially of real estate, are frequently made, upon taking from the vendee a mortgage for the purchase money. In this latter case, the vendor can rarely be the loser ; for if the purchaser fails to meet his engagement, so as to make it necessary to resort to the mortgage, upon a sale under a decree of foreclosure, he may himself purchase the land, or if he considers it for his interest, he may allow it to pass into other hands. Where this course is pursued, the vendor sometimes acquires the land greatly improved, at a price much below that at which he had sold it, still leaving the vendee his debtor for the difference.

If transactions of this kind be not uncommon in ordinary times, they must have been much more frequent, when the sale in question was made. That was a period of almost inconceivable excitement—the value of property tended upwards with ceaseless and rapid strides—almost every body was in market, either as a seller or buyer, and many in both characters. Not a few abandoned their ordinary business, and entered the arena of speculation—confidently expecting to realize wealth equal to their desires, as the result of a few days or weeks of anxiety and toil.

The allegation that G. J. S. W. had made a pretended sale of some thirty or forty slaves to L. M. H. W., with the view of defrauding his creditors, is met with a direct denial by both

of these defendants. It is admitted the former sold to the latter ten slaves, whose names are disclosed in the answers, for the sum of $8,750, for which the notes of the latter were taken, payable at the expiration of the terms of credit agreed upon. These notes, as well as those which were made upon the purchase of the land, it is averred by these defendants, were all transferred to Mrs. Jones in payment of a large debt, for money lent, and profits realized upon the sale of property, which was due her by G. J. S. W. The several transfers of property made by the latter to Mrs. J. more than extinguished that indebtedness, and the excess, it is affirmed, was fully and honestly settled by L. M. H. W. with G. J. S. W. previous to the institution of this suit.

The defendant L. M. H. W. also states that early in the year 1836, G. J. S. W. purchased of Benjamin Ivey a number of slaves, the names of whom are mentioned, for the sum of $44,000, to be paid at different periods. Shortly afterwards, he was applied to by his co-defendant, the purchaser, to take half of the slaves, and accordingly in October, or the first of November of that year, he accepted the proposition. The terms of the contract between these defendants was, that L. M. H. W. should have them for $18,500, to be paid in four equal instalments of $4,625 each : the first to be due immediately, the others in one, two and three years. The names of the slaves embraced by this purchase from L. M. H. W. are particularly stated, and it is alledged that all of them, with the exception of one, was delivered on his plantation about the first of January, 1837, through the agency of Ivey or G. J. S. W. Soon after the delivery, the defendant made three promissory notes, payable to G. J. S. W., for the amounts stated above, payable, respectively on the first day of January, 1838, 1839 and 1840—all negotiable and payable at the Bank of Mobile. For the cash payment, it is not remembered that any note was given. Ivey had a mortgage on all the slaves sold, and though L. M. H. W. had no dealings with him, he expected that the notes which he made would be transferred, or the money paid thereon, appropriated, so as to extinguish the lien. Accordingly he paid to Ivey $4,500 of the sum that was to be paid in cash, and the two last notes which had been transferred to him by indorsement ; the note

which became due on the first day of January, 1838, was in-
dorsed to H. B. Gwathmey, who received the amount there-
of from the maker. All these several payments were made
previous to the exhibition of the complainant's bill. So far
as it respects L. M. H. W. we think the mere recital of the
bill, and the answer of himself and co-defendant, G. J. S. W.
relieve the former from the imputation of fraud, and as against
the complainants, show a paramount right to the property,
unless the debt, or the amount of it, said to be owing to Mrs.
Jones, was simulated.

What we have already said, will apply with all force to
the purchase of land by G. A. B. W. The allegations of the
bill, in respect to the latter, and the denials of the answers
are similar, certainly quite as direct and positive. While the
defendant admits that he purchased lands of G. J. S. W. for
the sum of $25,000, for which he executed his notes, paya-
ble at different times, with a mortgage on the lands for their
security, he avers that he conveyed the same to Mrs. Jones,
and in consideration thereof, received from her the notes he
made for the purchase money, and of which she had become
the proprietor by indorsement. He declares that from what
he is informed, and believes, he does not doubt that the notes
were transferred to her *bona fide,* and for a valuable conside-
ration.

The answer of the defendant Clayton denies all fraud, so
far as any transaction of his, with either of the defendants to
the judgment is drawn in question. He admits that he pur-
chased two slaves of G. J. S. W. on a credit, but affirms that
the purchase was *bona fide,* and for a full price ; and that he
has made full payment for them; states that he entered into a
contract with his vendor, under which they built a saw and
grist mill in partnership—the terms of which are stated with
particularity; states the account of his partner with the firm,
which shows an indebtedness—alledges a new contract, by
which he was to employ the mills until the debt was extin-
guished, and then avers that before this was done, he gave
up the mills, so as to remove all obstacles to the sale of the
lands on which they were situated, upon his partner agreeing
that the interest thus given up, should be considered anequiv-
alent for the price of the slaves. This was assented to, by

Clayton, and the notes he had given for the purchase money delivered to him accordingly. Unless the answer of this defendant is overbalanced by proof, we can discover no grounds for a decree against him.

The answers of Mrs. Jones, G. J. S. W. and J. V. F. W. state the following facts: 1. That Mrs. Jones, in 1834-5 and 6, was making investments of money in Alabama, through her agent J. V. F. W.; that conveyances were made to her agent by name, so as to facilitate a re-sale and conveyance, as she resided in another State; and notes, &c. for the payment of money, or the performance of some other duty were made to, and with him. 2. During the years above mentioned, the defendant, G. J. S. W. borrowed of Mrs. J. money, amounting in the aggregate to $30,000, which he invested in the erection of " Walker's Cotton Press," in the city of Mobile, under an agreement that the profits derived from a sale of the property should be divided between himself and Mrs. J.; this property was disposed of at a large profit, and a settlement made with Mrs. J's agent, on the 15th May, 1836, when G. J. S. W. was found indebted to her in the sum of $58,176 98, and executed to the agent eleven notes of $5,000 each, and, and one for $3,176 98. These notes were payable at different times, as stated in the answers, and six of the former being for the loan of the money, bore interest from their date. 3. In 1837, G. J. S. W. did convey to J. A. Campbell of Mobile, upwards of fifty slaves, by deed of trust, to secure three promissory notes which the grantor was owing to D. Chandler, one for $1,577 25, due on the first day of November of that year; another for $5,950, due the 15th May of the same year; and the third due twelve months thereafter, for $3,982 65; also to secure the further sum of $6,000, being the amount of a promissory note made by G. J. S. W., J. V. F. W. and D. Chandler, for money borrowed by the first named maker; and in addition to the above, to secure the payment of one of the $5,000 notes made by G. J. S. W. on the settlement with Mrs. J., which drew interest from the date, and the note of $3,176 98. 4. The deed provided for a sale of the slaves, upon default being made by G. J. S. W. in the payment of any part of either of the debts intended to be secured—default being made *in toto*, D. Chand-

ler required the trustee to execute the trust; and in April, 1839, a sale was advertised according to the requirements of the deed, for the 6th of May, 1839. On the day appointed, the trustee was prevented by his professional engagements from attending the sale in person, and deputed G. A. B. Walker, by authority in writing, to superintend the sale. The slaves were accordingly sold on that day for full prices, and much the greater number of them bid off by J. V. F. W. as agent of Mrs. Jones—the grantor in the deed, G. A. B. W., G. J. S. W. and others being informed of the character in which J. V. F. W. purchased, and no effort to conceal it from any one. 5. Mrs. J. has been regarded by the defendants as the sole proprietor of these slaves ever since the sale—they were paid for by her, by applying the debt due to her, which they were intended to secure; with nine thousand dollars borrowed from J. P. King, of Augusta, Georgia, and by indulgence obtained from D. Chandler for the residue; which has been fully paid by her. It is admitted the slaves remained upon the "Belvidere plantation," up to the 1st January, 1841, but they were in Mrs. J's possession from the time of the sale, who rented the plantation for the years 1839 and 1840, paying therefor $1,000 for each year, which several sums were settled by Mrs. J. previous to the commencement of this suit. 6. The sale was fairly conducted—was not brought on by the defendants, but by the directions of D. Chandler alone, who would not consent to delay, though G. J. S. W. would gladly have postponed it until the end of the year.

7. G. J. S. W. and J. V. F. W, as well as Mrs. Jones, deny that at this time either of them have an interest in the "Factor's Press," in the city of Mobile. It is admitted that Beers & Prevost conveyed to the former an undivided half of the square of ground on which it has been since erected, to pay his indorsements for them, among which were two drafts for five thousand dollars each, drawn by B. & P. and accepted by J. V. F. W. At the time of that conveyance, this property was incumbered with an unsatisfied mortgage, and the title of those under whom Messrs. B. & P. claimed was supposed to be doubtful, in consequence of which G. J. S. W. could do nothing with it, towards paying the debts for which it was intended to provide. He therefore conveyed it

to J. V. F. W. to pay his acceptances, believing it would not be sufficient for that purpose. It was afterwards conveyed by the latter to Mrs. Jones, who, in consideration thereof guarantied the acceptances, and undertook with the acceptor to pay them. 8. The square of which this ground was a part, was then selected by the company as a site for a *cotton press*, and the interest of Mrs. Jones, (upon the mortgage and acceptances being discharged,) valued at $20,000, and certificates of stock for twenty shares were to issue to Mrs. J., or her assignee, in the press, and its appurtenances. Some slight modification was made in this arragement between Mrs. J. and the company, by which the interest of stockholders appreciated in value. Afterwards Mrs. J. sold her stock, and the incumbrances were paid off, and a profit of several thousand dollars reelized by her. 9. G. J. S. W. and Mrs. J. affirm by their answers what is said by L. M. H. W. and G. A. B. W. about their several purchases of land of the former, and the assignments of their notes and mortgages given, not only for the purchase money of the lands, but also the notes of L. M. H. W. for the ten slaves. Thus showing the indebtedness of G. J. S. W. and the manner of its extinguishment. 10. All the defendants concur in stating that Mrs. Jones was and had been reputed a lady of wealth, at and long before the time the transactions which are drawn in question took place. That she became a widow in 1815, by the death of her husband, and that the wife of her co-defendant J. V. F. Walker is her only child. From an exhibit accompanying Mrs. Jones' answer, it appears, the estate of her daughter was estimated, a few years after the death of Mr. Jones, at $29,000 or $30,000, but the greater part of this sum was made up by the estimated value of wild lands situated in the State of Georgia, from which less than one fourth the value has yet been realized. 11. Mrs. Walker was married in the city of New York, in August, 1836, being then in the 22d year of her age. She was educated by her mother at great cost, and the portion of her estate, with the exception of her slaves, which had came into her mother's possession, had been lost by the failure of Insurance and other companies, in purchasing the stock of which, the daughter's funds had been invested. Being an only child, Mrs. Jones had kept no account of dis-

bursements for the use of her daughter, and if the losses in stocks were allowed, owed her but little, if any thing. 12. These facts in respect to Mrs. Jones and her daughter were known to J. V. F. W.; and further, that she then had but six slaves, which were in Mrs. J's possession. Under these circumstances it was agreed by Mrs. Jones, her daughter, and J. V. F. W. previous to the marriage of the two latter, and in consideration thereof, that they would never call Mrs. J. to an account, that the six slaves should be conveyed to her, and that she should hold them and the estate of her daughter in absolute right. In December, 1836, J. V. F. W. conveyed the slaves by bill of sale to Mrs. J. for the consideration expressed, of $2,500; but no money was paid, and the writing was intended to operate as a release of the husband's interest, as he never had possession of the slaves. Mrs. J. at the same time voluntarily assuring her son-in-law, that she would endeavor to free him from debt; in compliance with which promise she has since paid upwards of thirty thousand dollars of his debts, and in addition thereto, has supported him and his wife ever since the marriage. The unsold wild lands which Mrs. Walker inherited from her father, were all conveyed to Charles J. Jenkins, of Augusta, Georgia, previous to the exhibition of the complainant's bill, to be disposed of by him, and the proceeds applied to the payment of a debt of about $35,000, which Mrs. Jones was owing to J. P. King, of the same city and State, for money borrowed by her, of him, at different times. 14. These wild lands are regarded by the defendants who are interested in them, as of but little value—it being altogether uncertain how much will be realized from them, and when. 15. Mrs. Jones, in her answer, relies on the foregoing facts, and also the statute of limitations, of six years, as a bar to so much of the bill as calls on her to render an account of the estate of her daughter; and J V F W and wife assent to the plea of the statute. But shoud an account be ordered, then Mrs. Jones insists on being allowed for the support of her daughter and son-in law since their marriage.

The several sums received by Mrs. Jones upon the account of the indebtedness of G. J. S. W. to her were as follows, viz: The notes of G. A. B. W. for $25,000; the notes of L.

Andrews & Bros. v. Jones, et al.

M. H. W. given upon his land purchase, $24,910—also his notes for the ten slaves, $8,750, and the amount of the two notes which G. J. S. W. had provided for by the deed of trust to J. A. Campbell, $8,176 98. From these several sums are to be deducted $660 of the notes for the ten slaves, which was paid by the maker to the payee, making in the aggregate $66,176, while the principal due Mrs. Jones was only $58,176. Now it must be remembered, that five of the $5,000 notes drew interest, from their date, and the other notes as they respectively matured. It cannot perhaps be affirmed, from the record, that the principal and interest due Mrs. Jones, was not equal to the amount of the paper, and price of the slaves by which it was extinguished. But if the fact be otherwise, it may be asked whether any law inhibits the party from stipulating for a *premium* upon an exchange of paper, if *bona fide* made? The right to purchase notes, or other securities at a depreciation, is clearly recognized, and we can discover no difference whether paper is obtained, or something else of value.

In respect to the ground upon which the "Factor's Press" was erected, there is nothing either in the answers or proofs, of which it can be predicated that it was not fairly acquired by Mrs. Jones. True, in the employment of the press and the sale to Bloodgood she realized a handsome profit, yet it by no means follows that she did not agree to pay for the interest she purchased, what was considered a fair price at the time she acquired it. The selection of the square of which the ground was a part, as a site for a large cotton press, most probably imparted to it a value which it did not previously possess; for if thus improved, it promised to be productive; and its enhanced value would be influenced by the profits anticipated. *Besides*, it is not unreasonable to infer, that the suspicion which rested upon the title, on investigation, was ascertained to be groundless, or was in some manner removed. But if these suppositions be unfounded, still it may be asked if any rule of law forbids Mrs. Jones from making the best bargain she could, when she assumed to pay the acceptances of her son-in-law for Messrs. Beers & Prevost. The property had been conveyed by the latter to G. J. S. W. to enable him

53

to provide for his indorsement of the same paper, and by the latter to J. V. F. W., that he might meet his acceptances ; and this he did by the sale to Mrs. Jones. It cannot be assumed, that in this transaction with her son-in-law, she acted unfairly, or intended to lend herself to the perpetration of a fraud upon his creditors. He then has no just cause of complaint; and if the sale was made in good faith, his creditors cannot impugn it, though the consideration be not equal to the value of the property ; for if a valuable consideration be paid or agreed upon, even if inadequate, and the sale *bona fide*, it will not be defeated, either by the common law, or under the statute of frauds. In respect to the matter under consideration, it would seem that if the sale to Mrs, Jones was objectionable to any one, an objection would come with greater propriety from Messrs Beers & Prevost, or their creditors—G. J. S. W., and J. V. F. W. were made depositories of the title for a purpose which the sale to Mrs. J. subserved.

No inference prejudicial to Mrs. Jones can be drawn from the fact that the slaves purchased by her agent continued upon the plantation where they were living at the time of the sale, for twenty months before they were removed. It is explicitly stated in the answers of G. J. S. W. and herself, that she rented the plantation for the remainder of the year 1839, and up to the 1st January, 1841—for the first year, at one thousand dollars ; for the second two thousand dollars was stipulated : but as the year was unfavorable to a crop, one half that sum was remitted. It does not appear what was the condition of the crop growing upon the Belvidere plantation at the time of the sale, or for how much it could then have been sold. Indeed, there is nothing from which it can be assumed, that one thousand dollars would not have been a full rent for either year. We cannot conceive of any objection to the remission of one half the rent of the second year, as it had been unfavorable to the interest of the lessee. By thus settling, the lesssor did not intend to make a gift, *pro tanto*, but merely to yield up that which an enlarged sense of moral justice, perhaps required he should not exact.

It was objected in argument, that the answers state that L. M. H. W. and Mrs. J. settled with G. S. J. W., the former, the $660, a part of his notes given for the ten slaves, the lat-

ter, the rent of the Belvidere plantation, for the years 1839 and '40. True the terms "settle" and "settlement," are used in various senses, and are to be understood, according to the occasion and subject matter in respect to which they are employed. Thus to settle accounts, may mean to adjust, liquidate, balance or pay them. Perhaps, where a pecuniary demand, which is *already adjusted* by note, or other writing, is said to be settled, we are to understand that it has been paid. But where it said, in respect to an account or a written security for money, that it has been settled fairly, and that nothing is due, or equivalent language is used, we must understand that it has been paid, or at least released. Conceding, however, that the answers of several of the defendants are exceptionable upon this point, and it may be asked if they should not have been excepted to in the court below, and the regular steps taken to enforce a sufficient answer; and if this course had been pursued without success, should not the point have been distinctly presented to this court? We think this question must receive an affirmative answer, and that neither of the assignments of error is sufficiently comprehensive or special to raise the point.

It cannot be maintained as a legal proposition that the guardian may not contract with his ward upon the latter attaining his majority, in respect to the estate entrusted to the management of the guardian. It may be conceded, that such contracts are regarded with suspicion, and unless fair, reasonable and just, will not be supported, if the guardian does not show that the ward was informed of the extent of his interest, and voluntarily disposed of it; or yielded it up without desiring any special information, for that which would, under all circumstances be more highly appreciated by him. In the present case, there seems to have been no intention on the part of Mrs. Jones, to deceive and overreach her daughter, or son-in-law. It does not appear that the daughter, at least, was not informed as to the nature and value of the estate which she derived from her father—all of them were doubtless aware of the sources from which accurate information could have been obtained, even if Mrs. J. had been ininclined to practice concealment. Without however extending this view, it may be observed, that if there was a contract

entered into between the adult daughter and her mother, in which both the daughter and a husband whom she afterwards married, acquiesces, creditors cannot successfully impugn it, upon the ground that it was unequal and prejudicial to the daughter. If it was intended to delay, hinder, or defraud creditors, then perhaps they might complain.

There is no rule of law which inhibits the admission of parol evidence to establish the fact of agency, even where the agent has been engaged in the purchase and sale of real estate. If the money of the principal has been used in the purchase of land, there will be a resulting trust in his favor, although a conveyance be made to the agent; and in such case, upon a re-sale, the principal will be entitled to the proceeds. Now, although J. V. F. W. was deputed only by parol as the agent of Mrs. J. and was verbally, and by letters which passed between them, recognized as such, we cannot doubt that he must be so regarded in a controversy between his creditors and Mrs. J. respecting the money or property the latter received from him.

It is unnecessary to consider with particularity, the proofs of the respective parties. They do not change this aspect—certainly do not weaken the effect, or in any manner impair the defence set up by the answers.

There is nothing in the record from which it can be assumed that Mrs. J. is indebted to G. J. S. W. for mules, plantation tools, &c. furnished upon the Belvidere plantation, in 1839 or 1840. If the answers of these defendants are not sufficiently explicit upon this, or any other point, the complainants should have excepted.

We are now brought to consider the effect of the parol agreement between Mrs. J., her daughter and son-in-law, previous to the marriage of the two latter. Our statute is explicit in the declaration, that " no action shall be brought whereby to charge any person, upon any agreement made upon consideration of marriage." [Clay's Dig. 254, § 1.] Under the 29 Car. 2, which contains an analagous provision, it has been held, that verbal agreements entered into before marriage, to convey property, or make a settlement in consideration of the marriage cannot be enforced. [Atherley on Mar. Set. 81 to 92.] Settlements after marriage, when made pur-

suant to contracts previously entered into, are operative a-
gainst creditors and purchasers; and this doctrine has been
sometimes carried so far as to sustain *post nuptial* settlements
which rest upon mere verbal agreements made before mar-
riage. [See 1 Ves. Jr. Rep. 196; 2 Lev. Rep. 147; Cro.
Jac. Rep. 454; 1 Vent. Rep. 193; 3 Johns. Ch. Rep. 491.]
But perhaps the weight both of argument and authority may
be unfavorable to the allowance of any influence to an ante-
nuptial verbal agreement, as the basis of a settlement consum-
mated after marriage. [12 Ves. Rep. 74.] So it must be
admitted that marriage brocage contracts are against public
policy, and therefore void. [See 1 Story's Eq. §§ 260 to
264; Chitty on Con. 552.]

But the agreement in question did not contemplate any
further act to be done by the daughter and son-in-law, in or-
der to complete it; unless the execution of the bill of sale for
the six slaves was necessary to its consummation. We think
it may well be questioned, whether, as Mrs. J. was in pos-
session of the slaves, any conveyance by writing was neces-
sary to invest her with the title, if the parol agreement was
valid against the creditors of the husband—in other words,
that the agreement, if valid, was executed at the time it was
made. In Brown v. Bellows, 4 Pick. Rep. 179, it was held,
that the statute of frauds had no application to a contract
which has been performed on both sides. So in Philbrook v.
Belknap, 6 Verm. Rep. 383, the court determined that the sta-
tute of frauds does not render illegal the performance of a pa-
rol contract, which it required to be in writing; and a party
may defend under such contract for an act done under it, or
sue for compensation for services performed. These citations
seem to us to lay down the law correctly, and if the agree-
ment in question was otherwise unobjectionable, if executed,
it will not be avoided because the statute of frauds requires
such contract, when executed, to be in writing.

It may be laid down in general terms, that marriage is not
only a meritorious, but is regarded by the law as a valuable con-
sideration. [Atherley or Mar. Set. 151; 2 Dess. R. 254.] To
make an ante-nuptial settlement void, as a fraud upon credi-
tors, it is necessary that both both parties should concur in,
or have notice of, the intended fraud. If the settler alone in-

tend a fraud, and the other party havs no notice of it, she is not, aud cannot be affected by it. [Atherley on Mar. Set. 129; 1 Atk. Rep. 158, 190; 17 Ves. Rep. 263; 1 Swanst. R. 319; 1 Roper on H. & W. 298; 6 East's Rep. 257; 8 Wheat. Rep. 389; 10 Id. 213; 4 Rand. Rep. 282; Roberts on Frauds, 102; 7 Pet. Rep. 348; 1 Brock. Rep. 330; 2 Id. 132.]

Marriage is, in legal effect, a gift to the husband of all the wife's chattels in her possession, and of her choses in action, if he reduce them into possession. But if the choses in action are not reduced into possession by the husband during the coverture, they remain the property of the wife on the dissolution of the marriage. [8 Mass. Rep. 99; 17 Id. 57; 9 Porter's Rep. 636; 12 Pick. Rep. 173; 11 Sergt. & R. Rep. 325.]

It has frequently been a mooted question, what constitutes such a possession, by the husband, of the wife's choses in action, as to invest him with an absolute title. In Stanwood v. Stanwood, 17 Mass. Rep. 57, it appeared that the wife, previous to her marriage, owned bank stock, on which the husband received the dividends until the charter of the bank expired, at which time the stockholders were entitled to take half the amount of their shares in the shares of a new bank, and the balance in money. The husband subscribed the authorized amount in his wife's name, and refused to receive the other half in money—saying it was not his, but his wife's, and it was thereupon passed to his credit. It was held, that he had not reduced the shares to possession, and that his wife should recover of his executor the balance, and the dividends received by him, with interest.

Where a suit is brought in the joint names of husband and wife, and judgment recovered accordingly, for a debt due to the latter before marriage, if the husband dies before it is collected, the right survives to the wife. So where the husband takes a new security in the name of his wife for a debt due to her at the time of the marriage, it is not such a reducing of the debt into possession by him as to deprive his wife of the right to such new security by survivorship. [9 Paige's Rep. 200; 2 Bail. Rep. 477.]

In the case of Hind's estate, 5 Wharton's Rep. 138, it was decided that the reduction into possession by a husband of his wife's choses in action, is in all cases *prima facie* evidence of conversion to his use; but this presumption may be repelled by proof that there was no intention to convert. Accordingly, where bank stock was bequeathed during coverture to the wife, and transferred to the husband absolutely, who gave a refunding bond to the executor, conditioned that the wife, her heirs, executors or administrators, should return the legacy, if required for payment of debts, and it appeared in evidence that the husband had spoken of the stock as the property of the wife, and had said that he gave the refunding bond as the surety of the wife, it was *held*, that these facts were sufficient to rebut the presumption of a conversion by the husband.

Between the husband and wife, his possession of a chose in action, it is said may be qualified by his intention, and the ownership follows his will; and the law is the same even against creditors or their trustees, under an insolvent act.— [6 Watts & S's Rep. 290.]

In Guchenback v. Rose, 4 Watts & S's Rep. 546, it was adjudged that a parol ante-nuptial settlement, by which the husband and wife agreed that the wife's chattels should continue her's, notwithstanding the marriage, and during its continuance were so treated by him, is binding at the decease of either or both, and the husband has no right of survivorship. *Further*, declarations by the husband, before and after the marriage, are evidence to show an ante-nuptial agreement for the wife's chattels.

The husband may sell the wife's choses in action, so as to defeat her right of survivorship, but cannot give them away freed from the incidents of the marriage. [1 Rawles' R. 279; 5 Monr. Rep. 343; 2 Vern. Rep. 401; 2 Ves. Rep. 675.] But the wife has an undoubted right to an adequate provision for herself and children, if any, out of her equitable estate, as against the husband or his assignee. [2 Johns. Ch. Rep. 206; 3 Cow. Rep. 590.] And when equity is applied to, to assist in the recovery of such property, that court will see that her rights are protected. [See 11 Gill & J's Rep. 15; 5 B. Monr. Rep. 29.]

In Gassett v. Grout, 4 Metc. Rep. 486, the wife's distributive share of her father's estate was in the hands of her former guardian, and the court *held* that an assignment thereof by the husband, in trust, for her separate use during her life, and for the use of her children after her decease, is not fraudulent as to his creditors, and they cannot reach such assigned property b ythe trustee process—a proceeding similar to our process of garnishment.

Where the husband was insolvent, so that it required the whole of her interest in certain slaves, (which he had not reduced to possession,) to support her, it was considered that the wife's equity was prior and superior to the claims of any general creditor; that as they could not be subject to the payment of his debts in any tribunal, it was not a fraud upon creditors, for the wife to sell them, with the assent of the husband, for the purpose of her maintenance and support. Although the sale or assignment by the husband, of the property of the wife not reduced to possession, is the exercise of such a dominion over it, as is a constructive reducing to possession, yet it has been held that the only effect of such a constructive reduction to possession, is to free the estate from the wife's legal right of survivorship, and not from her equitable right to have a provision made out of it for her maintenance, whenever a resort to a court of equity was necessary to obtain the actual possession, or the subject was brought under the control of that court. [4 B. Monr. Rep. 237.] *Further;* though property descended to the wife be placed in secret trust by the husband, to provide a maintenance for the wife, a creditor cannot reach it, if the wife, from the inability of the husband, stand in need of such maintenance. It was but the performance of a paramount duty, and what a chancellor would have done. [5 B. Monr. R. 29. To the same effect is 2 Bailey's Rep. 477.]

In Gallego v. Gallego's ex'rs, 2 Brock. Rep. 285, the right of the wife to a legacy bequeathed to her during the continuance of the marriage, as it respects the creditors of the husband, was most lucidly examined. It was there said, that a legacy bequeathed to a married woman, has never been classed with conveyances at common law, but with *choses in action*, and vests an equity in the wife herself, in which the

husband participates, so far only as to assert her title in a court of equity. " The property does not become his, nor is it subject to the liabilities which attach to that, which is his, until it shall be reduced to possession. Till then, his creditors have no claim to it." "It follows then, not only because mere rights cannot be taken in execution, without the aid of some special legislative provision, but because, also, there is no title in the husband to the thing itself, that a legacy not reduced to possession, is not liable for his debts." The learned Chief Justice then remarks, that the books furnish no case in which the naked question of the power of a court of equity to subject a legacy to the wife, to the payment of the husband's debts, has been discussed. "This," says he, "is of itself a strong, we think conclusive argument against the right. That a creditor has never applied to a court of chancery to interpose in his favor, and subject the *choses in action*, or the equitable rights of the wife, to his claim against the husband, demonstrates the universality of the opinion, that equity affords no aid in such a case." It was conceded that the assignees of a bankrupt could assert this right, upon the ground that they represent the bankrupt, as well as his creditors, and that the marital rights of the husband are transferred to them. When they come into equity asserting a claim on the equitable interests of the wife, they exercise the marital right to reduce those interests into possession—not any pre-existing right of the creditors. In such case, the court grants its aid on terms, viz : that such provision be made out of the property for the wife and children, as on a view of all the circumstances of the case may be deemed equitable. It was also said, "We can find no case in which a husband has been considered a purchaser of the equitable interests or *choses in action* of the wife, without some specific agreement by which he became so." The question is asked whether the husband may relinquish his marital rights in the estate of the wife not reduced into his possession. And it was said no direct precedent could be found upon the subject, but as a general proposition, it was considered that the relinquishment was valid against creditors, unless it be made in fraud of their rights. It is added, " In this case

54

there is reason to believe, that the husband is insolvent, and that he has relinquished to the wife that she may receive and enjoy the legacy bequeathed to her, secured from his creditors. In this, there is no injustice; his creditors trusted to his own resources for payment of their claims, and had no right to trust to the fortune of the testator. Creditors, generally, therefore cannot compel him to reduce the legacy of his wife to possession for their benefit." The learned and elaborate opinion of Gibson, Ch. J., in the case of Jordan's guardian, 4 Rawles' Rep. 468, strongly sustains the decision last cited, in all the principles we have educed from it, and affirms "that the actual possession of the husband does not bar the wife's title, where it is not intended to have that effect. [See also, 12 Ves. Rep. 497; 16 Id. 413; 20 Pick. R. 517; 3 Stewt. Rep. 172, 375; 8 Porter's Rep. 36; Clancy on R. &c., 2, 3, 109 to 112, 120 to 124; 7 H. & Johns. Rep. 257; 9 Porter's Rep. 39; 8 Ala. Rep. 146; 2 Ashmead's Rep. 455.]

We might fortify the principles which we have shown to have been recognized, upon the point we are considering, by other citations, but this is deemed wholly unnecessary. This opinion has been already drawn to a length which we did not anticipate; our apology will be found in the value of the interests involved, in the diffusiveness and expansiveness, (if the expressions be allowable) of the cause, and to the novelty of some of the questions discussed, at least as it respects this court.

The statute of frauds cannot impair the effect of the agreement between Mrs. Jones, her daughter and son-in-law. If it can be considered in the light of a contract which proposed to yield up to Mrs. J. by the two latter, their interest in the daughter's estate, then we have seen it would have been considered as executed, (except perhaps it be as to the six slaves,) and would not be undone, because the agreement was not evidenced by writing.

Conceding that the possession of the guardian is the possession of his ward, so as to invest the husband of *an adult female ward* by operation of law, *eo instanti* upon his marriage, with a title to the estate of his wife, and yet it will a-

vail nothing in the case at bar. It does not appear that Mrs. Jones was in the *actual possession* of any other personal property of her daughter than the slaves; and in respect to her entire estate, the daughter and her husband, in view of their marriage, which was soon to take place, relinquished it to the mother. To this relinquishment the parties have adhered ever since it was made, and by it they still manifest a determination to abide. This disclaimer of title and interest, if it does not operate as a release in favor of Mrs. Jones, will prevent the law from transferring by construction, her possession to her daughter and son-in-law. We have seen, that although the husband possesses himself of the wife's choses in action, it is allowable to show that the possession was as a trustee, &c., and not with the view of exercising his marital rights; and that his own declarations are admissible to prove that he renounced all claim to them, recognized them as his wife's, and took no steps towards reducing them into possession.

We think it perfectly clear then, that the possession of Mrs. Jones of her daughter's estate was undisturbed by the marriage, or by any act subsequently done, and if the relinquishment be void, the husband's right to reduce into possession the choses in action, or equitable interests of the wife, is a mere right, which he may or may not exercise; and if he foregoes it, a general creditor cannot, by any judicial proceedings, instituted at his own instance, make it available for the payment of his debt. The equity of the wife is certainly paramount to any claim of her husband's creditor, who should not have trusted for payment to property of which the debtor never was in possession, and of which he might never become its proprietor, even if he elected to attempt its recovery. But it is enough if the wife have an equal equity; for that, coupled with the legal title will give her the superior right in any tribunal. [1 Rawle's Rep. 452.]

In the relinquishment made by the daughter and her husband, there is nothing unnatural, or that should cause it to be looked on with suspicion. Mrs. Jones had doubtless watched over her daughter with a mother's care and solicitude, and bestowed upon her education, and training for the duties of life, the attention which intelligence, combined with elevated

morals, dictated, and which wealth with its consequent leisure permitted the parent of an only child to bestow.    For all this, she had kept no account of her expenditures—the estates of the mother and daughter had been commingled ; besides heavy losses had been sustained by unfortunate, (perhaps unauthorized,) investments of the daughter's funds. Here was ample room for protracted, expensive and uncertain litigation.    Was it unreasonable that the mother should, under such circumstances, desire her apprehensions to be quieted ?    And why should the daughter and son-in-law have refused to yield up the estate of the former ?    The daughter knew that in her mother she could repose all confidence— doubtless expected to be one of the same household during life, and if she survived her, might naturally calculate that she would be made the beneficiary of a mother's bounty. The husband could not have been indifferent to the influence of these considerations, and having no estate independently of his wife, could not honorably have objected to any reasonable disposition she desired to make of her own.    It cannot be assumed, in the aspect in which this case is presented, that the inducement to relinquish was the mother's assent to the marriage—the daughter had attained her majority, and however much she may have respected a mother's counsels, was not subject to a mother's restraint.    The fair inference is, that the relinquishment was made in view of the marriage, and in consideration that it was about to take place —its purpose was not only to quiet the fears of the mother, but to provide for the maintenance of the daughter and wife.

We must decline the consideration of the other points made in this cause ; for however decided, they cannot change the result.    Our conclusion is, that the decree of the court of chancery dismissing the bill must be affirmed.